**FLORIDA WILDLIFE FEDERATION, a Florida not-for-profit corporation; and Sierra Club Inc., a not-for-profit corporation, Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; and Colonel Robert M. Carpenter, District Engineer, in his official capacity, Defendants.**

No. 05–80339–CIV.

United States District Court, S.D. Florida.

Sept. 30, 2005.

Edwin Thom Rumberger, Rumberger Kirk & Caldwell, Tallahassee, FL, David P. Reiner, II, Reiner & Reiner, Miami, Lisa B. Interlandi, Robert N. Hartsell, Lake Park, Richard Joseph Grosso, Environmental & Land Use Law Center Inc, Fort Lauderdale, FL, for Florida Wildlife Federation, a Florida not for profit corporation; Sierra Club Inc., a not for profit corporation, plaintiffs.

Norman O. Hemming, III, United States Attorney's Office, Miami, FL, for Colonel Robert M. Carpenter, District Engineer, in his official capacity, United States Army Corps of Engineers, defendants.

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon Defendants' Motion for Summary Judgment (DE 39), filed August 8, 2005; and Plaintiffs' Motion for Summary Judgment (DE 41), filed August 8, 2005. The Court has considered the parties' filings, as well as the Brief *Amici Curiae* of Palm Beach County and The Scripps Research Institute. (DE 48.) A hearing on the parties' motions was held on September 26, 2005, where the parties and intervenors were heard.

In this action, the Florida Wildlife Federation and Sierra Club (collectively "Plaintiffs") challenge the issuance of a permit by Defendant U.S. Army Corps of Engineers to Palm Beach County, allowing the filling of federally regulated wetlands for the development of a joint project be-

tween Palm Beach County and The Scripps Research Institute, known as the Palm Beach County Biotechnology Research Park, on a property known as Mecca Farms. The permit allows for the development of 535 acres of the 1,919 acre Mecca Farms parcel designated for the Research Park. Plaintiffs allege that the Corps' decision to issue the permit violated the National Environmental Policy Act (NEPA), the Federal Clean Water Act (CWA), and the Rivers and Harbors Act of 1899. Plaintiffs ask the Court to find that the permit issued is invalid and to require the Corps to prepare an Environmental Impact Statement taking into account the entire scope of the planned development.

Plaintiff Florida Wildlife Federation (FWF) is a private, state-wide non-profit citizen's conservation education organization, with more than 1,000 members that live, own property or work in Palm Beach County. Plaintiff Sierra Club, Inc., is a non-profit organization interested in the protection and restoration of the natural and human environment, with approximately 30,000 members in the State of Florida.

Defendant U.S. Army Corps of Engineers is the agency of the federal government that issued the permit now being challenged. Defendant Colonel Robert M. Carpenter is the District Engineer of the Jacksonville District, and is sued in his official capacity.

*Amici Curiae* Palm Beach County and The Scripps Research Institute are contractually bound to build the proposed Bio-

technology Research Park on the Mecca Farms property.[1] A.R. 1628. Palm Beach County is the owner of the Mecca Farms site, and the Applicant for the permit now challenged. The Scripps Research Institute is an internationally recognized non-profit research organization, specializing in biomedical research into a number of areas, including molecular and cellular biology, chemistry, and synthetic vaccine development. Based in La Jolla, California, Scripps is located in a biotechnology cluster that includes other facilities such as the Salk Institute and the Burnham Institute.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 5 U.S.C. §§ 702 and 706(1), (2)(A), (C), (D) (Administrative Procedures Act); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 2201 (Declaratory Judgment Act).

Venue is proper in this district under 28 U.S.C. § 1391(b), as the actions giving rise to this claim occurred in the Southern District of Florida, and 28 U.S.C. § 1391(e) because it is a civil action against an agency and an officer of an agency of the United States acting in his official capacity under 5 U.S.C. § 703.

The Court has reviewed the record and is otherwise fully advised in the premises. The Court makes the following findings of fact and conclusions of law.[2]

## I. BACKGROUND

### A. The Palm Beach County Biotechnology Research Park[3]

On October 8, 2003, The Scripps Research Institute ("Scripps") announced

---

1. As this case involves the Court's review of administrative action, the Court denied in part the joint motion by Palm Beach County and The Scripps Research Institute to intervene as parties, granting them status as *Amici Curiae* during the merits phase of the case and status as parties during any remedial phase. (DE 37.)

2. Portions of the administrative record will cited as "A.R. [page number(s)]."

3. The nomenclature in this case becomes somewhat confusing, in that County documents refer the to entire planned development as "The Palm Beach County Biotechnology Research Park," while the Corps refers to the 535–acre proposed project as the "Bio-

plans to open a major East Coast science center in Florida, focusing on biomedical research, technology development, and drug design. A.R. 351.

Several sites were assessed to accommodate not only the Scripps Florida facility, but also new biotech research centers and related businesses expected to follow, as well as support facilities, including commercial services, educational facilities, civic uses, and residential development for the workforce. A.R. 351.

Ultimately, the Mecca Farms site, located in Palm Beach County, was selected. The Palm Beach County Business Development Board (BDB) acquired land rights for the site, consisting of the 1,919 acre Mecca Farms.[4]

On November 18, 2003, Palm Beach County and the Florida Office of Tourism, Trade, and Economic Development (OTTED) entered into a Memorandum of Agreement to allow for Expedited Permitting Review for the Mecca Farms site. A.R. 156. By December 18, 2003, the Army Corps of Engineers agreed to try to work with the County in an expeditious manner as well. A.R. 10.

In February 2004, Palm Beach County acquired land rights to the 1,919 Mecca Farms site, allowing the County to act as agent for the property owner and to submit applications for any changes in land use and zoning, and submit applications for any and all development approvals and permits. A.R. 172.

The County then filed with the State's OTTED a "Project Description Form for Expedited Permitting Review for the proposed Palm Beach County Biotechnology

Research Park to be located on approximately 1,920 acres in northwestern Palm Beach County." A.R. 183–12.

Palm Beach County, the project's Master Developer, described the Research Park as a multiple use development plan for approximately 1,920 acres of property, with Scripps as its centerpiece. A.R. 166–65. The County touted Scripps' "proven business model" which includes "developing a biotech/pharma industry cluster that has led to the start up of more than 40 high-tech businesses." A.R. 169. The County described the benefits of economic clustering, which is the location of industries in a particular geographic area in order to take advantage of labor pools or to gain convenient access to highly specialized services that are present to service the needs of an anchor business, such as, in this case. Scripps. A.R. 168. The County anticipated that Scripps' success in developing a biotech/pharma industry cluster in San Diego County could be replicated in Palm Beach County, at an even faster pace than that which was the case in California. A.R. 169. Palm Beach County noted that biotechnology has been described as the first global "gold rush" of the 21st-century. A.R. 168.

In March 2004, the OTTED certified the Research Park Project for Florida's Expedited Permitting Process pursuant to Florida law. A.R. 188. The Army Corps of Engineers attended the pre-application meeting for all interested agencies and parties. A.R. 2683.

On May 10, 2004, Palm Beach County submitted an Application for Development

technology Research Park" or "the Scripps Project."

For clarity, the Court here uses "The Palm Beach County Biotechnology Research Park" or "Research Park" to refer to the entire planned development. The Court refers to the proposed 535–acre project as "the pro-

posed project," "the 535–acre project," or "phase 1."

4. According to news reports, before Mecca Farms was selected definitively as the site, the BDB had also acquired land rights to the adjacent Vavrus Ranch parcel. A.R. 2192.

Approval (ADA) for the Palm Beach County Biotechnology Research Park Development of Regional Impact (DRI) to the Treasure Coast Regional Planning Council (TCRPC) pursuant to Florida law. A.R. 270–299. This comprehensive document addressed a number of projections related to the Research Park development over its 30–year build out schedule, including revenue, environmental resource impacts, transportation, human resource impacts (housing, police and fire rescue, recreation and open space, education, employment, health care, energy), airports, mining operations, schools and hospitals. A.R. 270–387; 489–792; 979–1046.

The County announced that "[t]he arrival of [Scripps] in Palm Beach County could prove to be as significant to South Florida's economy as the arrival of Henry Flagler's railroad a century ago." A.R. 330.

The State of Florida agreed to provide $310 million of economic stimulus funds over a period of seven years. Palm Beach County pledged to spend up to $200 million to provide land, infrastructure and buildings for the new Scripps Florida facility, paying $60 million for the 1,919 Mecca Farms site. A.R. 351. While the Scripps facility would occupy 102.03 acres, other portions of the property would be used to enhance surrounding ecosystems, meet water management goals, and buffer nearby residential properties. A.R. 351. The remaining property would be made available to other biotech-related companies and support facilities, "enabling the County to recover costs associated with the project." A.R. 351.

### B. Mecca Farms

Mecca Farms was historically part of the Hungryland Slough, and predominately wetland. A.R. 2686. Located in Palm Beach County, Mecca Farms is bordered to the west by the J.W. Corbett Wildlife Management Area, to the north by Hungryland Slough and active orange groves, to the east by undeveloped private land, and to the south by an active orange grove and residential development. A.R. 2686. Unit 11 Hungryland Slough and the J.W. Corbett Wildlife Management Park are preserved as conservation/ environmentally sensitive lands. A.R. 2633.

The July 1999 Loxahatchee River Basin Wetland Planning Project for Palm Beach County stated that the Vavrus Ranch (to the east of Mecca Farms) is one of the largest areas containing wetlands that have not been protected. A.R. 2661. In addition, the undeveloped land to the north may be prime foraging and/or nesting habitat for many endangered species including wood storks, peregrine falcons, bald eagles, Audobon's crested caracaras, and snail kites. A.R. 2643. The J.W. Corbett Wildlife Management Area could contain similar species. *Id.*

The Mecca Farms site was most recently an active citrus grove. The site was zoned Agricultural Residential in part and Special Agriculture in part, and had a Future Land Use designation of Rural Residential 10, which would allow up to one dwelling unit per 10 acres. A.R. 156.

To prepare the site for agriculture, ditches were constructed in place of historic flow ways to drain the site. The agricultural ditches are present throughout the site every 360 feet, and run in a north-south orientation throughout. A.R. 2144. The ditches, which are permanently inundated, are connected to the C–18 Canal, a tributary of the Northwest Fork of the Loxahatchee River. A.R. 2687; 2642. The ditches are therefore considered waters of the United States. A.R. 2685.

### C. The Permit Application

In order to build the Research Park development, the County requires a Section 404 permit from the U.S. Army Corps

of Engineers ("the Corps") to dredge and fill agricultural ditches on the Mecca Farms site under the Clean Water Act. 33 U.S.C. § 1344(a), (f)(2). The National Environmental Policy Act ("NEPA") requires the Corps to consider whether its action would significantly affect the quality of the human environment before issuing the permit. 42 U.S.C. § 4332(2)(c).

In May or June 2004, Palm Beach County filed an application for the permit now being challenged.[5] The proposal did not cover the entire Research Park development planned for the 1,919 acre site, but rather was limited to what the County called the Scripps Research Park, covering 535 acres of the site. The proposal included the construction of the Scripps Research Institute on 183 acres; a 30–acre town center with commercial and multifamily residential housing; a 27 acre clinic/hospital; a 15 acre utility site; three surface water management lakes totaling 87 acres; 3 acres of internal roads, 97 acres of upland hardwood forests, and 93 acres of open space A.R. 2686. As a result of the 535–acre project, approximately 21.3 acres of jurisdictional drainage ditches would be impacted. The existing open water quarry would also be expanded from its current size of 27.6 acres to 48 acres. A.R. 2686.

The County asked the Corps to evaluate its proposal to build "a 535–acre biotechnology research park" in the Mecca Farms site independently from the remaining future development on the 1,900 acre site, as well as from any future planned development in the nearby area because the biotechnology research park has independent utility from any future development. A.R. 2685–2684.

An alternative sites analysis was conducted, considering five alternative locations: Parcel 19; Palm Beach Park of Commerce; The Briger Parcel; The Riviera Beach CRA; and Florida Crystals site. A.R. 2670–2663.

In August 2004, the Corps published a Public Notice on the web, which was sent to all interested parties, including appropriate State and Federal agencies. A.R. 2682. In the Public Notice, the Corps announced that although it was aware that the County had plans to develop the remaining 1,365 acres of Mecca Farms, it believed that the 535 acre Project had "independent utility" from the larger Research Park Development because it could be constructed solely, without need for the remaining development. A.R. 1234.

The Corps' public notice time frame was extended from September 4, 2004 to October 4, 2004, since two major hurricanes affected South Florida during the time the comment period would have closed. A.R. 2682.

During the comment period, the U.S. Environmental Protection Agency (EPA) raised concerns with the alternative sites analysis, water storage and conveyance to the North Fork of the Loxahatchee River, prior converted wetlands, appropriate mitigation, water quality issues, the ecological benefit of the project, secondary and cumulative effects, and the development of adjacent properties. A.R. 2682.

The U.S. Fish and Wildlife Service (FWS) requested that the Corps include a determination for the eastern indigo snake. The FWS concurred with the Corps' subsequent determination that the project may affect but is not likely to adversely affect the eastern indigo snake, with construction precautions, and the woodstork.

5. An initial application covering 414 acres of the site was filed in May 2004, but was subsequently amended to cover 535 acres in June 2004. A.R. 2683. The Corps requested additional information, which it received in July 2004, at which point the Corps considered the application complete. *Id.*

The FWS did not object to the issuance of the permit, but recommended that the Corps coordinate overall project planning with the Everglades Restoration Program and ensure a "no net loss" wetland policy. A.R. 2682–81.

The National Marine Fisheries Service (NMFS), Habitat Conservation Division, expressed concerns with secondary and cumulative effects, further development of adjacent properties, avoidance and minimization, appropriate mitigation, prior converted wetlands, and evaluation of direct and indirect impacts as a result of the project. A.R. 2681.

The Comprehensive Everglades Restoration Program (CERP) acknowledged that a portion of the Mecca Farms parcel is a potential site for a stormwater treatment area or a reservoir within the CERP North Palm Beach County PIR, but believed that the County's agreement to provide a "flow way" that would transfer water to the C–18 Canal may allow a vital hydraulic conveyance to the Northwest Fork of the Loxahatchee River. A.R. 2680.

The State Historic Preservation Officer (SHPO) expressed no concerns with the project. A.R. 2681.

Several organizations, including Plaintiffs, and other interested parties and individuals responded to the public notice, expressing concerns including cumulative impacts, endangered species, historic resources, water quality, impacts to the Wild and Scenic River, Comprehensive Everglades Restoration Program (CERP), mitigation, alternative sites analysis, single and complete project, independent utility, cost to the taxpayers, development on adjacent properties, impacts to conservation lands, rate of development in Palm Beach County, secondary and cumulative impacts, watershed analysis, water resources, water supply, water storage, and compliance with the Palm Beach County Comprehensive Plan with Urban Development. A.R. 2681–80. The majority of commenters objected to the issuance of the permit.[6] A.R. 2638.

In October 2004, the County responded to the federal agency's comments; in November 2004, the County responded to the Corps' request for additional information. The Corps was satisfied with the responses. A.R. 2679.

During the pendency of the Corps permit application, the South Florida Water Management District (SFMWD) Governing Board approved an Environmental Resource Permit (ERP) permit for the entire 1,919 project. A.R. 1288–1302, 1305. The SFWMD also issued a permit titled "Conceptual Approval of a Surface Water Management System to Serve a 1919 Acre Project Known As the Palm Beach County Biotechnology Research Park and Construction and Operation of Phase 1A."[7] A.R. 2142. In addition, the Board of County Commissioners approved a zoning amendment that allowed a change in land use to support the entire development on Mecca Farms. A.R. 2640. Lastly, Palm Beach County issued a Resolution Approving the Palm Beach County Biotechnology Research Park DRI.[8]

In February 2005, the Corps issued an Environmental Assessment in which it found that Palm Beach County had shown the independent utility of the project warranting evaluation of the proposal independently from the remaining future planned development,[9] and concluded that the pro-

---

**6.** The Court found only one public comment in the record in support of the proposed development.

**7.** On December 8, 2004.

**8.** On October 13, 2004. A.R.1920—1892.

**9.** The Corps noted that it would evaluate and process any proposed future road construc-

posal would not have a significant impact on the environment. A.R. 2684. Finding no significant impact, the Corps did not prepare an Environmental Impact Statement, and issued the permit.[10] A.R. 2630. Further, believing all issues raised during the comment process had been identified and resolved, the Corps determined that a public hearing, which had been requested by many commenters, was not needed or required. A.R. 2631–2630.

## II. STANDARD AND SCOPE OF REVIEW

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Fed. R.Civ.P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Under the Administrative Procedure Act (APA), the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

Applying this standard, the Court must determine whether "the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416, 91 S.Ct. 814; *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851; *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533 (11th Cir. 1990).

■ Although the Court must generally defer to agency determinations, the Court "must overturn agency actions which do

not scrupulously follow the regulations and procedures promulgated by the agency itself." *Sierra Club v. Martin,* 168 F.3d 1, 4 (11th Cir.1999) (citation omitted).

■ Agency action must be set aside if the agency relies on factors which Congress did not intend for it to consider, entirely fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).[11] Although the court's review is to be searching and careful, the court cannot substitute its judgment for that of the agency's. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814.

■ When a court reviews a decision under the APA, "[t]he focal point for judicial review of an administrative agency's action should be the administrative record." *Preserve Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs,* 87 F.3d 1242, 1246 (11th Cir.1996)(citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). A court, however, "may consider additional evidence if it explains the record or if it addresses whether all relevant factors were considered." *Western North Carolina Alliance v. North Carolina Dep't of Transp.,* 312 F.Supp.2d 765, 770 (citing *Virginia Agricultural Growers Ass'n v. Donovan,* 774 F.2d 89, 92 (4th Cir.1985)); *See also Save Our Ten Acres v. Kreger,*

---

tion/expansion under a separate application number once it is submitted. A.R. 2683.

10. The Corps further found that the permit authorizing discharge complies with the Section 4040(b)(1) guidelines. A.R. 2630.

11. *See also Wyoming Outdoor Council Powder River Basin Resources Council v. U.S. Army Corps of Eng'rs,* 351 F.Supp.2d 1232 (D.Wyo. 2005).

472 F.2d 463 (5th Cir.1973)(District Court may rely on the record evidence if court makes a threshold determination that the information available to the agency did not adequately discuss the environmental effects and alternatives). In reviewing the Corps' decision in this case, the Court has not considered evidence beyond the administrative record that the Corps certified was before the agency when it made its decision.

## III. THE CLEAN WATER ACT

The Clean Water Act (CWA), 33 U.S.C. § 1251 *et seq.*, is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the CWA, dredged or fill materials are pollutants. 33 U.S.C. § 1362(6). Section 404 of the CWA authorizes the Corps to issue permits "after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters," including wetlands, under specific circumstances. 33 U.S.C. § 1344.

When evaluating a permit application, the Corps must first evaluate whether the activity is water dependent. If the proposal is not water dependent, there is a presumption that practicable alternatives that do not involve special aquatic sites exist, unless clearly demonstrated otherwise. 40 C.F.R. § 230.10(a)(3). In addition, the Corps shall not issue a permit for the discharge of dredged or fill material "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

The Corps' regulations provide that "Although a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area." 33 CFR § 320.4(b)(3).

If the permit applicant establishes that no less damaging, practicable alternative is available, the applicant must then show that all "appropriate and practicable steps" will be taken to minimize adverse effects of the discharge on the wetlands. 40 C.F.R. § 230.10(d).[12] Only after showing that avoidance and minimization criteria have been met, can the Corps consider mitigation.

Pursuant to 40 C.F.R. § 230.5, the Corps, as the permitting authority should "[e]xamine practicable alternatives to the proposed discharge, that is, not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences; evaluate the various physical and chemical components which characterize the non-living environment of the candidate site, the substrate and the water including its dynamic characteristics; identify and evaluate any special or critical characteristics of the candidate disposal site, and surrounding areas which might be affected by use of such site, related to their living communities or human uses; evaluate the material to be discharged to determine the possibility of chemical contamination or physical incompatibility of the material to be discharged; identify appropriate and

---

**12.** Except as otherwise provided, "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize

potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d)

practicable changes to the project plan to minimize the environmental impact of the discharge."

The 404 Guidelines require the Corps to consider "both individual and cumulative impacts" of the proposed project, as well as practicable alternatives that would have less adverse impact on aquatic systems. 40 CFR § 230.6 and .10(a). The Corps must balance "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

The Corps' regulations provide that "[a]lthough a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area." 33 CFR § 320.4(b)(3).

## IV. THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

Congress enacted NEPA "to encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation[.]" 42 U.S.C. § 4321. In particular, Congress recognized "the profound influences of population growth, high-density urbanization, industrial expansion [and] resource exploitation on the natural environment" and "the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man." 42 U.S.C. § 4331(a).

To these ends, NEPA requires federal agencies to consider "environmental amenities and values" in planning and decision-making which may have an impact on the environment. 42 U.S.C. § 4332; *C.A.R.E. Now, Inc., v. Federal Aviation Admin.*, 844 F.2d 1569, 1572 (11th Cir.1988). NEPA establishes important "action-forcing" procedures to ensure that the "broad national commitment to protecting and promoting environmental quality" is "infused into" the actions of the federal government. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

In particular, the statutory requirement that an agency contemplating a major federal action prepare an environmental impact statement "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts[.]" It also serves the important purpose of making that information available to a larger audience that may also play a role in the decision-making process, assuring the public that the agency has considered all relevant environmental concerns in its decision-making, and "provid[ing] a springboard for public comment." *Robertson*, 490 U.S. at 349, 109 S.Ct. 1835.

■ Perhaps most importantly, by focusing an agency's attention on the environmental consequences of a proposed project, the "action-forcing" nature of NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (citations omitted). For this important reason, adequate environmental evaluation must occur sufficiently early in the planning process to be meaningful. *North Buckhead*, 903 F.2d

1533, 1540 (11th Cir.1990). NEPA does not, however, mandate particular results. The statute "prohibits uninformed—rather than unwise—agency action." *Robertson,* 490 U.S. at 351, 109 S.Ct. 1835.

Congress created the Council on Environmental Quality (CEQ) to promulgate regulations applicable to all federal agencies in order to promote and implement the NEPA policy. 42 U.S.C. § 4342.

CEQ regulations direct agencies to prepare an Environmental Assessment (EA) in order to determine whether the environmental effects of a proposed action are "significant." 40 C.F.R. §§ 1501.3, 1501.4(b), 1508.9, 1508.27.

Under CEQ regulations, "significance" requires consideration of both context and intensity. Context considerations include the affected region, interests and locality, varying with the setting of the action, and include both short and long-term effects. Intensity refers to the severity of impact, including impacts that may be both beneficial and adverse; unique characteristics of the geographic area, such as proximity to wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its habitat; and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27.

The purpose of an Environmental Analysis (EA) is to "briefly provide sufficient evidence and analysis" to determine whether the proposed action will have a significant impact. 40 C.F.R. § 1508.27. To determine whether a federal action is "significant," an agency must consider the direct, indirect, and cumulative impacts on the environment. 40 C.F.R. §§ 1508.8, § 1508.27(b). If the agency finds no significant impact (FONSI), then no further evaluation of the environmental effects is required. 40 C.F.R. §§ 1508.9, 1508.13. If, on the other hand, the agency finds a significant impact, the agency must prepare an Environmental Impact Statement (EIS) to detail the environmental consequences of the proposed action. 42 U.S.C. § 4332(2)(c); *Hill v. Boy,* 144 F.3d 1446, 1450 (11th Cir.1998)(citing *Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 677 (5th Cir.1992)).

An agency's finding of no significant impact and decision not to prepare an EIS are final administrative decisions reviewable under the APA. 5 U.S.C. § 701 et seq. The "arbitrary and capricious" standard applies to the Court's review of the Corps' decision not to prepare an EIS. *Hill,* 144 F.3d at 1450.

■ The Eleventh Circuit has adopted a four-part test to determine whether an agency's decision not to prepare an EIS is arbitrary and capricious: (1) the agency must have accurately identified the relevant environmental concerns; (2) the agency must then take a "hard look" at those concerns when preparing the EA; (3) the agency must make a convincing case for a finding of no significant impact; and (4) if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. *Hill,* 144 F.3d at 1450; *Sierra Club v. U.S. Army Corps of Eng'rs,* 295 F.3d 1209, 1216 (11th Cir.2002) (court must ensure that the agency took a "hard look" at the environmental consequences of a proposed action).

## V. ANALYSIS

The crux of Plaintiffs' complaint is that the Corps acted arbitrarily and capricious-

ly by failing to consider the impact of the entire 1919 development when it concluded that the 535 acre portion of the project, having independent utility, would not have a significant impact on the environment, and therefore issued the permit for the County to develop that portion without preparing an EIS.

Plaintiffs raise three theories in support of this argument: (1) that the Corps unlawfully segmented the project to avoid a finding of significance; (2) that the Corps' finding that Phase I had independent utility was arbitrary and capricious; (3) that the Corps' environmental analysis failed to consider and take a hard look at all environmental concerns, including (a) impacts; (b) controversy; and (c) alternatives.

## A. MAJOR FEDERAL ACTION AND SCOPE OF ANALYSIS

■ The Corps first argues that while the issuance of the Section 404 permit in this case was a "federal" action, it is not necessarily a "major" federal action, triggering requirements of NEPA. *See* 40 C.F.R. § 1508.18 ("major" reinforces but does not have a meaning independent of "significantly").

The Court finds this argument to be without merit. The Corps relies on the Eleventh Circuit's holding that the requirements of NEPA apply only when the federal government's involvement in the project is sufficient to constitute a "major

federal action." *U.S. v. Southern Florida Water Management Dist.* 28 F.3d 1563, 1572 (11th Cir.1994). In that case, however, the issue before the court was whether the state's restoration program was "federalized" under a settlement agreement for purposes of NEPA. 28 F.3d at 1573 ("NEPA applies only when there is federal decision-making, not merely federal involvement in non-federal decision-making.") The Eleventh Circuit further noted that "A federal agency may undertake a major federal action in the form of funding as a part of the restoration program, issuance of a permit or license to a State agency, or a change of operations over which the federal agency has authority." In this case, the Section 404 permit constitutes major federal action, particularly in view of the fact that the proposed project could not be constructed in its absence.

■ The Corps further argues that it properly limited the scope of its analysis to the aspects of the project over which it had sufficient "control and responsibility" to warrant federal review. The Corps' NEPA regulations provide that where activity requiring a permit is "merely one component of a larger project" ... the scope of the environmental review should "address the impacts of the specific activity requiring the permit and those portions of the entire project over which the district engineer has sufficient control and responsibility." 33 C.F.R. Part 325, Appx. B § 7(b).[13] The Corps' determination of the

13. The regulations further provide that:

The district engineer is considered to have control and responsibility for portions of the project beyond the limits of the Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action.

Typical factors to be considered in determining whether sufficient "control and responsibility" exists include:
(i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).
(ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

appropriate scope of the environmental review process is entitled to deference. *See Marsh*, 490 U.S. at 375–76, 109 S.Ct. 1851; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

The Corps relies on *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105 (9th Cir.2000), where the Corps prepared an EA on the dredging and filling of wetlands that excluded analysis of cumulative impacts associated with development in the uplands area which was outside the Corps' jurisdiction. 222 F.3d at 1112. The Ninth Circuit relied on its holding in *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394 (9th Cir. 1989), which involved filling wetlands for a golf course that was part of a larger resort complex. In *Sylvester*, the Court had held that although the golf course and the entire resort complex "would benefit from the other's presence" they were not sufficiently interrelated to constitute a single "federal action" for NEPA purposes (desire to place golf course in a meadow that contains wetlands did not federalize entire resort). 884 F.2d at 400. The Ninth Circuit distinguished the case the district court had relied on to reverse the agency's finding, *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985). In *Thomas*, the court required the U.S. Forest Service's EIS to encompass the effects of both the proposed road construction and the timber sales that the road construction was designed to facilitate.[14] There, the Forest Service did not dispute the fact that it would need to assess the environmental impacts of both actions at some point and that it had jurisdiction over both actions. In addition, the Forest Service's cost-benefit analysis was

based on the value of the timber to be sold. *Thomas*, 753 F.2d at 758.

The facts of this case are more similar to those in *Thomas* that those in *Sylvester*. Here, the Corps has conceded that it was aware of plans for future development; that it will have jurisdiction over the next phases of development; and that it anticipates applications for those phases. Still, the Corps did not evaluate those effects. In addition, as discussed in more detail below, the Corps here considered the economic benefits of the entirety of the project in its analysis, rather than limiting that analysis to phase 1. In addition, unlike in *Sylvester*, the Research Park Project Plan was developed as an integrated whole along a continuum, with Scripps as its centerpiece triggering related biotechnology growth.

The Corps' reliance on certain examples in the regulations is misplaced. The example cited is, that if a County seeks a permit to fill wetlands, the control and responsibility of the Corps extends to the portions of the project to be located on the permitted fill, and to the entire project, including portions outside waters of the U.S., only if sufficient control and responsibility over the entire project were determined to exist; that is, if the regulated activities comprised a substantial portion of the overall project. 33 C.F.R. Part 325, Appx. B, § 7(b)(3).

Rather than confirm the Corps' restrictive view of its environmental analysis, this example would tend to support the view that the Corps' scope of analysis should have included, at the least, the development of the remainder of Mecca Farms. Unlike the example above, the filling of wetlands on Mecca is not a discrete task,

---

(iii) The extent to which the entire project will be within Corps jurisdiction.
(iv) The extent of cumulative Federal control and responsibility.
33 C.F.R. Part 325, Appendix B § 7(b)(2).

**14.** The Ninth Circuit reached this conclusion by finding the actions to be "connected" under CEQ regulations for preparing an EIS.

because the jurisdictional ditches run throughout the site, every 360 feet. Indeed for this reason, the Corps did not, and could not, limit the scope of its analysis to "21.3 acres" of ditches. In addition, the Corps has acknowledged that more jurisdictional ditches occur throughout the remainder of the site, giving the Corps jurisdiction over those areas as well. The Corps has also stated that numerous wetlands are located on the Vavrus Ranch. In this sense, then, it can only be expected that the Corps will have sufficient control and responsibility over the upcoming development proposals.

The County emphasizes that the wetlands located on Mecca Farms are of "low ecological value." This characterization, while relevant to the direct effects of dredging and filling, and to mitigation, however, does not diminish the Corps' jurisdiction, the scope of its analysis, or its obligation to consider environmental effects under NEPA of its permit action.

## B. SEGMENTATION [15]

■ The anti-segmentation rule is generally that an agency "cannot 'evade [its] responsibilities' under the National Environmental Policy Act by 'artificially dividing a major federal action into smaller components, each without a "significant" impact.' " *PEACH v. U.S. Army Corps,* 87 F.3d 1242, 1247 (11th Cir.1996)(quoting *Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 68 (D.C.Cir.1987)). Segmentation is intended to prevent "agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.' " *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 297–98 (D.C.Cir.1988)(quoting *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985)).

Plaintiffs argue that the Corps unlawfully segmented this project in two ways: first, by limiting its environmental analysis to the effects of the 535–acre project rather than the complete 1,919–acre project; and second, by authorizing the extension of PGA Boulevard within the 535–acre project boundaries without taking into account its projected connection to the Bee Line Highway across wetlands.

■ Relying primarily on *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Corps contends that it did not unlawfully segment the project because there were no permit applications before the Corps for any other development project or roadway improvement beyond the 535–acre project when it made its environmental assessment.

In *Kleppe,* the Court held that "when several proposals for ... actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." 427 U.S. at 410, 96 S.Ct. 2718.

Subsequent CEQ regulations codified that holding, by requiring that an EIS include consideration of connected, cumulative and similar actions. 40 C.F.R. § 1508.25.[16] Relying on this regulation, the

---

**15.** NEPA requires agencies to prepare an Environmental Impact Statement on any major federal action with significant impact on the environment. "Major Federal action" is defined to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 CFR § 1508.18. In this case, it is undisputed that the major federal action is the Corps' permit, which allows the County to proceed with the 535–acre development which includes filling 21.3 acres of jurisdictional wetlands.

**16.** That section, in full, provides that:

Corps further argues that it did not unlawfully segment the 535–acre project from the larger project because segmentation turns on whether two or more "actions" are connected. Connected actions are defined as those that "(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification."

Importantly, in *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 999 (5th Cir.1981), while finding that NEPA did not require the Corps to complete an EIS on a project "still in the process of study and design" based on *Kleppe*, the Fifth Circuit noted that *Kleppe* "also leaves room for a court to prohibit segmentation or require a comprehensive EIS for two projects, even when one is not yet proposed, if an agency has egregiously or arbitrarily violated the underlying purpose of NEPA." By way of illustration, the Fifth Circuit cited *Named*

*Individual Members of San Antonio Conservation Soc.*, 446 F.2d 1013 (5th Cir. 1971), where it had previously held that the Secretary of Transportation exceeded his authority by segmenting a highway project to allow construction of two "end segments," each leading to the borders of a treasured city park, while postponing the "middle segment" for "further study." The Court found that construction of the two end segments would have effectively eliminated any alternatives to using the middle park land for the third segment.

That case is particularly instructive here, insofar as Plaintiffs' claims regarding the segmentation of PGA Boulevard are concerned.

The parties do not dispute that the Corps' permit authorizes the construction of a road across the southern end of the proposed project site that is ultimately planned as an extension of PGA Boulevard from Seminole Pratt Whitney Road to the Bee Line Highway. A.R. 2713.

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:
(a) Actions (other than unconnected single actions) which may be:
(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:
(i) Automatically trigger other actions which may require environmental impact statements.
(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.
(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.
(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.
(b) Alternatives, which include: (1) No action alternative.
(2) Other reasonable courses of actions.
(3) Mitigation measures (not in the proposed action).
(c) Impacts, which may be:
(1) Direct;
(2) indirect;
(3) cumulative.

The Corps concedes that it is aware of this planned extension, but argues that it need not consider this or any other road extension because 1) they are not necessary to the proposed project; 2) the state has not approved or fully analyzed road construction or expansion; and 3) the County has not acquired the rights of way that may be needed.[17] As early as December 2003, the Corps noted, in an internal email on "the latest info on Scripps," that "the bigger environmental issues will be the proposed access roads—extension of Seminole Pratt Whitney Road." A.R. 4.

Plaintiffs argue in particular that by authorizing the construction of PGA Boulevard through the site, the Corps has predetermined the ultimate alignment of the connecting PGA extension, as it will have to connect the existing portion to the newly permitted segment through wetlands, and preclude the ability to thoroughly evaluate alternative alignments. The Court agrees.

One need only review the map of the proposed site in context to see that the placement of a PGA Boulevard extension as conceived by the County and approved by the Corps will ultimately require a connection through an area on what the parties agree includes high value wetlands.

In fact, the maps initially submitted by the Corps indicated that the road would be extended, although the extension was indicated by arrows only, alignment to be determined. The maps were revised by the County only after the Corps instructed the County to indicate the roads ending in cul-de-sacs.[18] The Corps explains that it instructed the County to do this because it

had not approved any road extension beyond the project boundaries.

In any event, however, the Corps was duty bound to evaluate the plans of the County, particularly where the Corps had specifically noted that the access roads presented the "bigger" or more "troublesome" environmental issues of the planned development. Just as a project may not be unlawfully segmented to avoid significance, the concept of "independent utility" should not be manipulated to avoid significance or "troublesome" environmental issues, in order to expedite the permitting process.

Citing *Sierra Club v. Callaway*, 499 F.2d 982 (5th Cir.1974), the Corps argues that the fact that roadways within a system interconnect does not require them to be considered as a single project for NEPA purposes. However, in *Callaway*, the Fifth Circuit approved the segmentation of two related federal water projects, finding that each project was separately authorized and funded; and that one was only a minuscule component of the other, viable alone, mostly finished, and had independent utility. Here, by contrast, the permitted road and the planned extension are part and parcel of development intended by the County and conceived of as an integrated whole. Far from a "minuscule component" of the larger project, the initial phase is intended as the anchor and catalyst for the remaining development.

The Corps also relies on *Daly v. Volpe*, 514 F.2d 1106 (9th Cir.1975). There, in an action challenging the sufficiency of an EIS, the Court upheld the agency's segmentation of a proposed highway where

**17.** The Corps notes that currently, PGA Boulevard is four miles east of Mecca Farms. A.R. 367. The Corps also cites to a news report that as of December 2004, the widening of PGA Boulevard had been rejected as

premature, and that current zoning did not support it.

**18.** The County in its May 2004 Application had proposed the road as ending in a cul-de-sac.

although the segment was not clearly between logical termini, it had independent utility as a by-pass for a town currently plagued by extreme congestion; and did not foreclose an adequate discussion of alternatives.

In *Preserve Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps*, 87 F.3d 1242, plaintiffs challenged a proposed highway construction project that would run through a historic district in Cobb County and impact approximately 3.77 acres of wetlands. After the County developed a mitigation plan, the Corps found no significant impact and issued the permit. Plaintiffs claimed that the Corps' analysis of the proposed project alone, rather than in conjunction with other related projects in the County, was arbitrary and capricious. The Court upheld that Corps' approach under the Federal Highway Administration guidelines, that the proposed highway project had logical termini ("all roads must begin and end somewhere") and independent utility, and that the scope of analysis of the proposed road would not restrict consideration of alternatives for other reasonably foreseeable transportation improvements elsewhere.

 Although the road permitted here can stand alone—as any road could—it cannot be said that ending an extension of PGA Boulevard in a cul-de-sac is a logical terminus, particularly when strategically placed in a property that is planned and expected to induce significant development. Further, it is clear that the full benefit of this road is realized only when it is extended to the Bee Line Highway as planned. In addition, by permitting the construction of a road along the mostly southern border of the proposed project site, the Corps risks foreclosing the wide range of options for building roads intended to service the entire development. "If proceeding with one project will, because of functional or economic dependence, foreclose options or irretrievably commit resources to future projects, the environmental consequences of the projects should be evaluated together." *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir.1981). "A highway segment to nowhere, for example, should not be evaluated apart from later connectors that will be necessary to make the initial segment useful." *Id.* It is abundantly clear from this record that the County's planned road extensions raise a number of important environmental concerns. By permitting the first step toward road expansion now without considering those effects, the Corps has arbitrarily and capriciously determined that the proposed project will not have any significant environmental impact.

This finding of no significant impact, particularly in view of the record evidence that the Corps anticipated significant environmental consequences associated with the road expansions, is sufficiently contrary to the underlying policy of NEPA to warrant review of the planned extensions even though not formally proposed.

The Corps urges that this case presents different facts, because in *Named Individual Members*, the three proposed highway segments were before the agency when it elected to segment them. However, the Court in *Named Individual Members* not only condemned the segmentation as unauthorized agency action under the relevant statute, but also as unlawful because of the "frustrating effect such piecemeal administrative approvals would have on the vitality of [the protective statute]."[19] 446 F.2d at 1021. The Fifth Circuit noted that

---

**19.** The plaintiffs in that case relied on a provision of the Department of Transportation Act of 1966, 23 U.S.C.A. § 138 (Supp.1971), which provided for that agency's policy to preserve parks, natural refuges and other recreation areas.

"[p]atently, the construction of these two 'end segments' to the very border, if not into, the Parklands, will make destruction of further parklands inevitable, or, at least, will severely limit the number of 'feasible and prudent' alternatives to avoiding the Park. The Secretary's approach to his ... responsibilities thus makes a joke of the 'feasible and prudent alternatives' standard, and we not only decline to give such an approach our imprimatur, we specifically declare it unlawful."

While the instant case does not present the same egregious conduct found in *Named Individual Members*, the Court is troubled by the Corps' authorization of a segment of PGA Boulevard within the proposed project, and ending in a cul-de-sac, without examining the reasonably foreseeable environmental issues the Corps itself identified.

## C. INDEPENDENT UTILITY

The Corps also argues that its analysis was properly limited to the 535–acre proposed project because that project has "independent utility."

 The Corps defines independent utility as "A test to determine what constitutes a single and complete project in the Corps regulatory program. A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility." 67 Fed.Reg.2094 (Jan. 15, 2002).

In its EA, the Corps stated that it believed that Palm Beach County had shown that the 535–acre project had independent utility from (1) the remaining future development on the 1,919 acre Mecca Farms site; (2) the development on Vavrus Ranch; (3) and the construction of future roads. A.R. 2684. The Corps explained that it reached this conclusion:

because the biotechnology research park could be constructed alone, without need for the remaining development, and is not dependent on that other development for its success. In addition, no new roads would be constructed outside of the 535–acre site as a result of the biotechnology research park... Moreover, the development of Vavrus Ranch and the remainder of Mecca Farms are likely even if the SCRIPPS Biotechnology Park is not built.

A.R. 2684.[20]

 Plaintiffs argue that the "independent utility" determination was arbitrary and capricious, and that it is betrayed by the record, which they contend shows that the 535–project, the remaining Mecca development, and development of Vavrus Ranch are "inextricably related." Plaintiffs emphasize that the County's vision has always been that of a unified campus, with Scripps as its anchor, and that the County selected the Mecca site for its size. Plaintiffs also argue that it is insufficient for the Corps to rely exclusively on the County's representations of independent utility to make this determination.

The assessment of independent utility "reveals whether the project is indeed a separate project, justifying the consideration of the environmental effects of that project alone." 87 F.3d at 1247 (citing

---

20. The Corps based its conclusion that development on Mecca and Vavrus would occur regardless on the bare assertion that Mecca "would be a preferred site for development under Corps regulations" and Vavrus "would clearly be developable under the Corps regulations." A.R. 2684.

*Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 440 (5th Cir. 1981)). The Court must defer to the Corps' interpretation of its own regulations. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, that deference is afforded so long as there is a reasonable basis in the record for the Corps' determinations.

In *PEACH*, the Corps "required Cobb County to show that the project had independent utility," which the County did relying on more than fifty exhibits. 87 F.3d at 1248. The Corps based its conclusion on a review of the Minutes of the Board of Commissioners for Cobb County, maps showing the county's transportation plans, and transportation studies conducted by the county. 87 F.3d at 1247.

The record in this case, however, is starkingly different from the facts presented in *PEACH*. The inescapable conclusion from this record is that the Research Park Project was conceptualized as an integrated whole, progressing in phases, and that the 535–acre project was never intended to stand alone—not, that is, until time came to apply for a CWA permit. The record also reflects a sense of urgency, and that the Corps early on committed to try to expedite the process, even though in the end more than eight months passed between the formal application and the permit's issuance.

The administrative record in this case actually begins in November 2003, about six months before the Corps contends the County's Permit Application was filed. In December 2003, Corps attends a "Scripps Expedited Preliminary Permitting Project—Preliminary Agency Briefing," which includes a discussion about the Compre-hensive Plan Amendment and the DRI. The agenda includes a "Preliminary Time Frame Discussion," but no mention or allusion to a stand alone project. A.R. 7. On December 18, 2003, in an internal email a Corps' member writes, "[The County is] going through the expedited permit process with the State and the Corps has agreed to try and work with them in an expeditious manner as well." A.R. 10.

In February 2004, the County files a "Project Description Form for Expedited Permitting Review for the proposed Palm Beach County Biotechnology Research Park to be located on approximately 1,920 acres in northwestern Palm Beach County" with the Office of Tourism, Trade and Economic Development, and sent a copy to the Corps. A.R. 12–183.

The County documents state that "the extension of Seminole Pratt Whitney Road will occur along the western side of the site." A.R. 165–166. In addition, the County "anticipates that construction of Seminole Pratt Whitney Road from Northlake Boulevard north to its planned intersection with PGA Boulevard will begin January 2005," the same time the County is to deliver the first 100 acres to Scripps to build the initial facility. A.R. 18. "Construction of PGA Boulevard from Seminole Pratt Whitney Road East to Scripps will begin September 2005." A.R. 18. The County notes that the PGA extension off-site would not be required until after the initial phase. A.R.1908.

In March 2004, the Corps acknowledges receiving the County's Application.[21]

On March 14, 2004, an internal Corps email again states that the Corps had committed to completing the "evaluation as fast as possible." Specifically, the Corps

---

21. A.R. 482 (copy of postcard to the County indicating the Corps' receipt of the Application dated March 11, 2004); and A.R. 223 (email dated March 12, 2004 stating that Corps Project Manager received the Scripps Application). According to the EA, the Corps did not deem the County's Application filed, however, until May 2004.

member writes that the Corps had "indicated that we need to look at the whole project, because of uncertainty about roads to the site. The first phase site is an orange grove (Mecca Farms) with very little Corps regulated areas. However, the road access they are discussing would have substantial impact on high-quality wetlands." A.R. 224.

On March 16, 2004, the County provides a description of the project, writing "Proposed is a research park development on approximately 1,920 acres in the northwestern region of Palm Beach County." A.R. 228.

On March 18, 2004, the County provides the Corps with a description of the "Palm Beach County Biotechnology Research Park" as a "multiple use development planned for approximately 1,920 acres of property in the northwestern portion of Palm Beach County." A.R. 234. The description adds that adjoining Vavrus Ranch "is being considered for development with similar and complementary uses to what is proposed for the Research Park. Efforts to jointly plan for both developments are underway[.]" A.R. 234. The document further states that "a preliminary program has been developed for the approximately 1,920–acre property Palm Beach County Biotechnology Research Park[.]" A.R. 232. The Scripps Research Institute (TSRI) is described as the "centerpiece" of the project. A.R. 232. The County describes its intent as the master developer as follows:

> [T]o develop a project that is sustainable and economically viable by creating a master plan that clusters the uses to promote intellectual exchange between the researchers and scientists at TSRI

and other related companies, provides for a range of workforce housing to help minimize traffic impacts on surrounding roadways and provide obtainable housing for administrative and support staff, provides convenient retail, restaurant and other shopping opportunities for the workforce and residents, and promotes an integrated development that incorporates transportation alternatives to the automobile by incorporating a connected pathway, bikeway and multi-use rail system throughout the project.

A.R. 232. In addition, the document states that "[t]he presence of TSRI in Palm Beach County, along with the influence of high-tech markets, will encourage other industries to locate their facilities at this site ... These facilities will consist of approximately 8.5 million gross square feet of building space [.]" A.R. 231.[22]

An internal Corps email "Re: Scripps" states that the Corps is working "on the associated road infrastructure." A.R. 238. The Corps member writes that a state expedited review is underway "because of the economic benefits to the state" and that the Corps has "indicated that we will do our best to keep pace with the state's review." A.R. 238.

In April 2004, an internal Corps email attaches a "fact sheet" its regulatory project manager prepared. That fact sheet states:

> This project proposes to develop a 1,919–acre site ... by constructing a biotechnological and biomedical research and pharmaceutical business park known as the SCRIPPS park. Within the 1,919 acre site, the project also proposes to construct single-family residen-

22. Apparently in response to an article that appears in a newspaper, a member from the public submits the first comment in this administrative record regarding the project. She states, "This gets more interesting, when even the Army Corps of Engineers will lower their standards to expedite permits for building in the wetlands so that Scripps can have 545 people employed by the end of 2006." A.R. 236.

tial areas, multi-family residential areas, commercial areas, recreation areas, a high school, a university, surface water management lakes, a greenbelt area and associated roads... The Corps has said we will evaluate the application as quickly as we can recognizing the importance of the project to the local economy.

The Corps notes that "initially identified roads would connect to existing roads through high value wetlands" and that the Corps had "identified that concern to the State and County." A.R. 242. Later that month, the Corps and the U.S. Fish and Wildlife Service (FWS) exchange emails related to both the Vavrus and Mecca "projects." A.R. 256. In response to a FWS request for more information, the Corps writes:

> These are definitely the types of issues that will have to be resolved as we collectively look at cumulative and secondary impacts associated with these two projects... As far as FDOT is concerned, they have been working on revisions to their planning process and budget to incorporate the roads in the vicinity of Scripps in their schedule... Roads such as PGA and Northlake will become bigger issues as time goes on. I'm really not sure what the County is doing with their roads (i.e.Pratt–Whitney).

A.R. 256. The FWS asks whether FDOT has "specialists to address wildlife corridor issues" and whether "the appropriate expertise [will] be available [to the County and State project planners] to adequately address the habitat fragmentation associated with Vavrus and Mecca." A.R. 260.

Then, on April 27, 2004, the "independent utility" concept appears in the record for the first time. In an internal Corps email regarding how to respond to press inquiries, one Corps member states that he explained to a reporter that the Corps had not yet received the application from the County, but that the Corps "would be conducting a thorough review for the overall project, particularly as it relates to associated roads and other infrastructure that may ultimately be constructed as a result of Scripps. We also told him of the potential for the review of the Scripps facility itself ... under the concept of 'independent utility' under the demonstration by the County ... that Scripps itself will be built in the absence of anything else." A.R. 262. Another Corps member responds, "If the press simply asks about Scripps it seems to me we should describe the independent utility project we understand the County plans to submit. *If we receive such a permit application we should be able to complete our review in approximately the time the State plans.*" A.R. 261 (emphasis added).

On April 28, 2004, the Corps revises its fact sheet to describe a 100–acre project on the Mecca site, using existing roads on a portion of the property making the wetland impacts "minimal." The fact sheet adds that "the permitting issues for this portion of the project are less complicated when compared to the permitting issues on the northeast portion of the property or where newly proposed roads would connect to existing roads through high value off-site wetlands." A.R. 263. A subsequent revision on or about that same day describes the 535–acre project that the "Corps believes ... has independent utility from the remaining planned development on the 1,900–acre site because the biotechnology research park could stand alone, without the need for the remaining development." [23]

---

**23.** Although the Corps' Index to the Administrative Record dates this fact sheet on or about April 28, 2004, the Court notes that the fact sheet also states that the Corps has granted the permit and describes the County's mitigation plans.

The inescapable conclusion from this record is that the "independent utility" concept is developed post-hoc as an avenue to limit and expedite permit review.

At oral argument, the Corps conceded that it relied entirely on the County's representations as to the proposed project's independent utility. Indeed, the only evidence in the record as to the proposed project's independent utility are conclusory statements by the County.

Specifically, in May 2004, the County submitted a formal application for a 414–acre project, stating that "No widening of existing roads is necessary for the proposed project and the proposed project does not rely on any other projects or expansions; it is a complete stand-alone project with no wetland impacts." [24] A.R. 481. In October 2004, in response to concerns by the EPA that all needed biotechnology-related development and site access should be considered in the analysis, the County responded that although "the remainder of the Mecca Farms site is proposed for development ... the current proposed project has independent utility and will function as a stand alone project; it does not require any of the future development or roadway extensions/expansions." A.R. 1587. In response to the EPA concern that approval of this application could lead to piecemeal development of significant wetland resources for other biotechnology related growth, and that therefore all potential secondary and cumulative effects should be considered, the County responded that because the proposed project has independent utility, no secondary or cumulative effects on the aquatic environment would occur. A.R. 1576. In response to NMFS concern

about potential secondary and cumulative impacts to adjacent wetlands caused by project related or induced construction and development, the County responded ·that because the proposed project has independent utility, no secondary or cumulative effects on the aquatic environment will occur. A.R. 1584.

In November 2004, in response to a request from the Corps for additional information as to the proposed project's independent utility, the County responded that detailed traffic studies were performed as part of the DRI and Planned Industrial Park Development (PIPD) approvals, that it was determined that the project as proposed would not require additional road improvements or extensions and that this conclusion had been "ratified" by a Palm Beach County Resolution. The resolution, dated October 25, 2004, approves the DRI for the entire 1,919 project, and includes a "Roadway Improvement" section on every phase of the development but Phase I.[25] A.R.1911–1905. ("Phase I will not rely on that section of PGA Boulevard between the eastern limits of the Research Park to the Bee Line Highway. The extension of PGA Boulevard from the eastern limits of the Research Park to the Bee Line Highway will be designed as part of the latter phases of the DRI, with construction occurring after the design and permitting has been completed.") See also, A.R. 356.

The County also wrote that "[t]he ultimate plans for the Biotechnology Research Park (BRP) does include a [power] substation located in the extreme southeast corner of J.W. Corbett Wildlife Management Area (JWCWMA), and it is the intent of Palm Beach County/ Florida Power and

---

24. When asked whether the proposal was a phase of a larger project in the Application, the County responded, "no."

25. Phase I in the Resolution is defined by reference to the TCRPC Council's DRI Assessment Report, revised Exh. MP–5. Phase I will only require extension of Seminole Pratt Whitney Road. A.R. 343.

Light to permit this substation separately in the near future." The County noted that if such a permit were denied, "an alternative option exists that will allow the currently proposed 535–acre project to maintain its independent utility ... the placement of a substation on the Mecca site [which] would require new transmission lines on the east side of Seminole Pratt Whitney Road." The County added, however, that this "is not the preferred option because some existing residential properties along the east side of [Seminole Pratt Whitney] Road would need to be acquired to allow installation of the transmission lines and poles necessary for this option and would not be as reliable as placing the substation adjacent to the existing transmission lines and installing buried ductbanks." A.R.1978.

The County continued to describe the purpose of the project as "to house a cluster of related life science research and development activities by both public and private entities" with TSRI as "an anchor." A.R.1977.

As to the Corps' evaluation of the proposed project's independent utility, the Corps is only able to cite to two internal Corps emails where the issue is discussed. The first email, dated April 30, 2004, is in response to a question about how to answer press inquiries about discussions between the County and the Corps. A Corps member provides the following response:

> Yes, the Corps South Permits Branch has met with the County on Scripps. We discussed the County's plans and in particular the potential phasing of the Scripps project it self [sic] and potential related development. The Core Scripps facility would be constructed entirely on the orange grove, MECCA Farms. Road access for the core research facility exist [sic], but would be upgraded. A

permit from the Corps is required, but only for filling several ditches onsite. *Since the County has stated to the Corps that the core Scripps facility will be built at this site, whether or not any additional facilities, housing etc is constructed on or near the site, the Scripps research facility has what we call independent utility.* That means that the core research facility will be built at this location regardless of any other development. Since the Corps views this first phase to have independent utility, we have also told the County that any decision we make on the first small phase does not mean we will or will not authorized [sic] other related development.

A.R. 269 (emphasis added). In the second email, dated June 28, 2004, a Corps' member related what he told members of the EPA about the Corps' position:

> The 400 acres for the Scripps Lab itself and some other commercial [sic] has independent utility. So we can act on that application on its own. *I am very comfortable with this because it is clear they will build this whether or not the more troublesome work on the roads and the Vavrus Ranch go forward.* Moreover, Vavrus may not even sell his land to the Town of Palm Beach Gardens. Residential development will occur, with some other commercial on the remaining several hundred acres of orange grove on Mecca Farms (where the Scripps Lab itself will be). Other development over many years may be on Vavrus (there are many developable portions on Vavrus and it is only a matter of time before they are developed. We will deal with that when the applications come in, we do not even know who the applicant may be.)

A.R. 1068 (emphasis added).[26]

The Corps now also argues that its position is supported by the County's DRI

---

**26.** The email noted that certain members of the EPA were not comfortable with the Corps'

Application, which provides for several phases of development, with the phasing and intensity of uses possibly changing depending on the market. A.R. 269; 1068; 343. That Application, however, cannot be the basis for the Corps' determination that the project has independent utility, particularly where the overwhelming weight of the evidence in that same Application is that the development is conceived of as a unified whole. Nowhere in the DRI Application is "Phase I" addressed as a development with independent value or utility.

In support of its reliance on the County's representations that Phase I would be built regardless of additional development, the Corps cites *Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 836 F.2d 760 (2nd Cir.1988)(finding independent utility based on district court's factual finding that the Navy would proceed with the operational aspects of one action with or without the other); and *Northwest Environmental Defense Center v. Wood*, 947 F.Supp. 1371, 1386 (D.Or.1996)(where an applicant sought to develop a facility in three phases, but later withdrew phase III from consideration, the court found that the Corps' conclusion that phases I and II of a project had independent utility from phase III was not arbitrary and capricious where the Corps found that phase III was not essential to accomplishing the project purpose; and it was uncertain when, whether, and to what extent phase III would be pursued); and *Coalition for a Liveable Westside v. U.S. Dep't of Hous. & Urban Dev.*, 1997 WL 349950 (S.D.N.Y.)("only actions that are 'interdependent,' not those that are merely interrelated, should be considered connected actions for environmental review purposes and given the developer's representation

that it would proceed with the project regardless of whether the other projects went forward, those projects were not connected actions so that HUD did not have to conduct environmental review broader than project specifically asked to finance").

■ The Court is not persuaded by those authorities under the facts presented in this case. Representations by the applicant alone, who clearly has an interest in obtaining the permit and whose theory of "independent utility" on a record such as this, can only be considered a post-hoc rationalization to secure a permit as rapidly as possible, cannot be sufficient to establish a project's independent utility, without independent evaluation by the agency based on record evidence. Without such a basis, the Court is unable to adequately review the agency's determination, nor can the public have confidence in the agency's determination.

Not unlike the impropriety of segmentation to avoid significance, manipulation of a project design to conform to a concept of independent utility, particularly with the intention that a permit be expedited, undermines the underlying purposes of NEPA.

### D. IMPACTS

Even if the proposed project were not unlawfully segmented, and the Corps' conclusion of its independent utility were adequately supported and evaluated in the record, having defined the scope of its analysis the Corps is still duty bound to address "direct, indirect and cumulative impacts on all Federal interests within the purview of the NEPA statute." 33 C.F.R. Part 325, Appendix B § 7(b)(3).

position, but that others "were very reasonable and understood, I believe even agreed, with our position." *Id.* The Court notes that the Corps' conclusion that the 535–acre pro-

ject "is not dependent on that other development for *its success*" goes beyond the content of those emails. A.R. 2864.

### a. Indirect effects

Indirect effects include those that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." They "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 CFR § 1508.8.

The Corps argues that it was not required to evaluate the potential impacts from the development of the remainder of Mecca Farms or Vavrus Ranch because its permit action cannot be said to be *the cause* of future growth. In support of this proposition, the Corps cites to its repeated acknowledgment in the EA that "there is intense development pressure in Palm Beach County" and that additional development is likely to occur with or without the proposed project.[27]

The problem with the Corps' conclusion, however, is that it is wholly unsupported by the record. There is no basis in the record for the Corps' determination that a "generalized development pressure" exists on or around Mecca Farms. In fact, the evidence in the record would tend to negate that conclusion, given that before the County developed its Biotechnology Research Park plan, Mecca Farms was an active citrus grove. A.R. 2687. The record also shows that the County secured re-zoning for the entire property in order to be able to pursue this project.

In addition, the record reflects a dramatic and concerted effort on the part of the County and the State to develop a biotechnology industry, with Scripps as its anchor and centerpiece, that will ultimately occupy the entirety of Mecca Farms, with supporting facilities on Vavrus Ranch. At the very least, as regards Mecca, the County secured economic stimulus funds, land rights, re-zoning, and expedited permitting at the State level, all with the objective of establishing Scripps in Florida for the express purpose of inducing growth. *See Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F.Supp.2d 30, 41 (D.D.C.2000)(Corps' failure to consider growth-inducing effects of permitting floating casinos was arbitrary and capricious where economic development was announced goal and anticipated consequence of casino projects; record showed that only reasonable prediction was that of increased growth; and developers themselves had trumpeted development to come to make their plans attractive to the community).

The Corps' reliance on the holding in *Department of Transp. v. Public Citizen*, 541 U.S. 752, 770, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004), that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect" is misplaced on many levels. That case involved a challenge to the Federal Motor Carrier Safety Administration's failure to consider the environmental impact that might be caused by the increased presence of Mexican trucks in the United States when it issued proposed regulations to grant operating authority to Mexican motor carriers. The Court held that because the agency lacked discretion to prevent cross-border operations of Mexican

---

27. The Corps, however, is not entirely consistent on this point, at other times in the EA stating that it is "aware that future development and constructions activities may occur in the area *if this permit is issued*," and that "[i]f the biotechnology research park development were to occur on the Mecca Farms site, the increase in development on the available private lands, including Vavrus Ranch, would occur because of the development pressures." A.R. 2685; 2661.

motor carriers, neither NEPA nor the Clean Air Act (CAA) required the agency to evaluate environmental effects of such operations.

The Court stated that " 'but for' causation was insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations. NEPA requires a 'reasonably close causal relationship' akin to proximate cause in tort law." 541 U.S. at 754, 124 S.Ct. 2204. Applying the "rule of reason" inherent in NEPA, the Court found that the causal relationship between the agency action and the environmental effect was insufficient to require NEPA analysis, and that neither purpose of NEPA's EIS requirement—that an agency have the information necessary to make its decision and that the public receive that information so it might also play a role in the decisionmaking process—would be fulfilled by requiring the agency to consider the environmental impacts at issue. The Court further noted that because FMCSA had no ability to prevent such cross-border traffic, it lacked the power to act on any additional information contained in an EIS or submitted by the public. 541 U.S. at 754, 124 S.Ct. 2204.

Here, by contrast, the Corps conceded not only that the proposed project could not be constructed without the Section 404 permit now challenged, but also that the Corps would have jurisdiction over development of the remainder of Mecca Farms, which contains jurisdictional wetlands throughout, and the adjacent Vavrus Ranch, which contains hundreds of acres of high value wetlands. Quite to the contrary of the facts presented in *Department of Transp. v. Public Citizen*, the Corps in this case does have the discretion to prevent or manage the indirect effects of its permit on the land at issue. Further, applying the "rule of reason," in this case the purposes of NEPA's EIS requirement would be served by requiring the agency to consider these indirect effects. Lastly, the record irrefutably shows that the Scripps development is not intended to serve an existing need, but rather expected to serve as a catalyst for growth.

The Corps' argument that the "inevitability" of development of these lands somehow breaks any causal connection is not only unsupported by the record, but is also legally untenable, as it is based on cases that are entirely inapposite. In *Citizens' Committee to Save Our Canyons v. U.S. Forest Service*, 297 F.3d 1012 (10th Cir. 2002), plaintiffs challenged the U.S. Forest Service's conclusion that its "interchange" of federal land with a ski resort qualified for a "categorical exclusion" from NEPA review because the resulting land uses remained essentially the same.[28] The Court upheld the Forest Service's conclusion that although the lands had been undeveloped before the interchange, they were already subject to skiing activity; transferring ownership to the ski resort would not alter their essential use or character; and regardless of whether the interchange occurred, the ski resort intended to develop the surrounding land which it owned and "which already engulfed the federal tracts subject to the interchange." The Forest Service therefore found that the federal lands would be surrounded by development regardless of whether the interchange occurred. 297 F.3d at 1023–24. No such "inevitable" development beyond the Corps' reach is at issue here.

In *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152 (10th Cir. 2002), the Court upheld an agency finding,

---

**28.** An "interchange" was defined as a transaction where the federal government and "another person" exchange lands or interests in lands of approximately equal value without formal appraisal.

based on consultation with local planners, that "ultimate growth patterns and planned land uses would not change" as a result of building a proposed parkway, even though there was evidence that municipal planners had modified their land use plans to accommodate the sprawl that they anticipated from the construction of the parkway. 305 F.3d at 1173–74. Here, however, the Corps has not cited to any adequate basis in the record for its conclusion regarding growth. In fact, as noted above, the record instead leads inescapably to the conclusion that the proposed project will have growth-inducing effects. Further, unlike the facts presented here, in *Utahns for Better Transp.*, the parkway had been under consideration for years, and many local governments had revised their land use plans during that time. By contract, the County here clearly crafted its entire plan in furtherance of the planned development.

The Corps' reliance on *Florida Wildlife Federation v. Goldschmidt*, 506 F.Supp. 350, 368 (S.D.Fla.1981) is similarly misplaced. There, the Court found that construction of I–75 would not induce growth where the record showed that development in the area was already planned, committed, zoned and in progress irrespective of the highway. The Court found that the plaintiffs basic premise—that access to transportation induces development—was debatable where developments had already arisen in the area without such access.

■ Here, instead, there is no evidence that any development, much less of the sort and intensity contemplated by the County, has been planned, committed, zoned and in progress irrespective of establishing the Scripps facility. In fact, only the contrary conclusion—that the establishment of Scripps will be growth inducing—is supported by the record. Indeed, the state's Governor likened the arrival of Scripps to Florida to the arrival of Flagler's railroad, and described the explosive growth of the biotech industry as the "gold rush" of the century.

The EA's repeated statements that the Corps "is aware" that future development may occur, that the proposed project "may entice" further development are a grossly inadequate consideration of the reasonably foreseeable indirect effects the Corps' permitting of the proposed project will cause. The Corps failed to consider and take a "hard look" at the growth inducing effects of the proposed project as required by NEPA.

**b. Cumulative effects**

The Corps is also required to take a "hard look" at the cumulative effects of the proposed project. For purposes of determining significance, the CEQ regulations define "Cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, *and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.* Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 CFR § 1508.7.

The Section 404 Guidelines under the Clean Water Act require the Corps to consider "both individual and cumulative impacts" of the proposed project, as well as practicable alternatives that would have less adverse impact on aquatic systems. 40 CFR § 230.6 and .10(a).

The Corps noted that if further development were permitted, as planned, "impacts could occur to the surface water ditches and the water catchment area to the northeast of the Mecca Farms site, as well as any possible wetland impacts on the Vavrus Ranch." A.R. 2635.

The Corps also noted possible cumulative impacts on adjacent conservation ar-

eas; Florida Power & Light's plans to construct a power substation on Corbett to supply the entire Mecca site; and planned increases to roadways. A.R. 2634. Finding that it only needed to consider the effects of "cumulative actions," that is, those that are already proposed, however, the Corps declined to consider the cumulative effects of future planned development. A.R. 2653. Instead, the Corps stated that it would "evaluate any cumulative impacts associated with future potential development on adjacent property, the Vavrus Ranch, new road constructions, or supporting projects ... when applications are received that trigger their review." A.R. 2642; see also A.R. 2632.

Relying primarily on *Park County Resource Council, Inc. v. U.S. Dept. of Agriculture*, 817 F.2d 609, 623 (10th Cir. 1987)(over-ruled on other grounds by *Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992)), the Corps argues that its analysis was proper because it need only consider cumulative impacts when actions are "so interdependent that it would be unwise or irrational to complete one without the others" (adopting cumulative impacts standard in *Webb v. Gorsuch*, 699 F.2d 157, 161 (4th Cir.1983)(citing *Sierra Club v. Froehlke*, 534 F.2d 1289, 1297–99 (8th Cir.1976) and *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir.1974))).

At issue in *Park County* was Forest Service's failure to prepare an EIS evaluating the "the eventual cumulative and foreseeable effects of exploratory drilling and then full field development" from federal oil and gas leases in the Rocky Mountain region national forests. 817 F.2d at

622. There, the Court rejected plaintiffs' argument that these cumulative effects should be studied on the basis that "[f]ull field development is typically an extremely tentative possibility at best at the leasing stage." 817 F.2d at 623. In particular the Court found that "exploration activities are conducted on only about one of ten federal leases issued and development activities are conducted on only one of ten of those leases on which exploration activities have been approved and completed." 817 F.2d at 623. The Court found that a cumulative impact EIS was not necessary because "the steps from leasing to full field development were not so interdependent that it would be unwise or irrational to complete one without the others." 817 F.2d at 623. The Court added that the developmental plans in that case were not concrete enough at the leasing stage to require such an inquiry.

The cumulative effects the Plaintiffs here raise, however, are not so tentative or unlikely. At the very least, that the planned development of the entirety of Mecca Farms is reasonably foreseeable is amply demonstrated by the record, which shows that the County has undertaken concrete steps to advance the future development by securing land rights, re-zoning and expedited permitting as to the entire project. Further, the record shows that while TSRI may have independent utility, it was not intended as a stand-alone project, but as a catalyst for a much larger development. Lastly, the imminence of future action is supported by evidence in the record that more than two months before this permit issued, the Corps and the County were discussing the next phases of the Mecca development.[29] Rather

---

**29.** In a December 9, 2004, the Corps Project Manager stated in an email that she was meeting with a County representative on that day to discuss Scripps and "the next phases of Mecca," including a power substation. A.R. 2110.

In the EA, the Corps noted the County's plans to construct a power substation in the southeast corner of the J.W. Corbett Wildlife Management Area to supply a permanent power source "for the overall development on the Mecca Farms parcel." The Corps, how-

than being speculative, the future development of, at the least, the remainder of Mecca Farms is being actively pursued.

The Corps cites to a number of other cases of "phased development," where courts have found it appropriate to limit environmental analysis to part of a multi-phase project, on the basis that future phases were not to be reasonably foreseeable. The facts in those cases, however, are readily distinguished from those presented here.

In *Vieux Carre v. Pierce,* 719 F.2d 1272 (5th Cir.1983), an action against HUD, the Fifth Circuit found that environmental analysis was properly limited to phase two of a five-phase city revitalization plan, where the master plan was developed in the mid–1970s; the first phase was completed in 1979; the second phase application was made in 1981; but the remaining phases were of a too indefinite and speculative nature to be considered. There, the court noted that no final plans or private funding commitments existed, no further design work or land acquisition had been performed since 1978, and the developer of phase two did not own the land or air rights to all phases. Contrary to the plaintiffs' allegation that phase three was omitted for the sole purpose of avoiding environmental scrutiny, the court found that the record showed that all plans for that phase and other future phases had been shelved for economic and other reasons.

Here, instead, the Research Park Plan was developed within the last year. While the plan contemplated "phases," the Research Park Plan does not contemplate a series of projects, but rather an integrated whole, with Scripps as its centerpiece. The County secured land rights, re-zoning, and expedited permitting for the Mecca

Farms site to accomplish the larger project. The County and State committed funds not so that Scripps would stand alone, but with the entire project in mind. Here, only one developer, the County controls the rights for Mecca Farms. Lastly, no phase of the project has been shelved for any reason; future phases only await the first (catalyst) phase.

In *Airport Neighbors Alliance, Inc. v. U.S.,* 90 F.3d 426 (10th Cir.1996), plaintiffs challenged the approval of a proposed runway upgrade at the Albuquerque International Airport to accommodate an anticipated influx of passengers, arguing that the proposed runway was only one component of a larger contemplated expansion at the airport, and that the Federal Aviation Administration had failed to consider the cumulative effects of that expansion. The FAA found that the runway project had independent utility from the remainder of the master plan designed to be completed in 20 years, which included expansion of the passenger terminal, construction of a second parking structure, construction of a new cargo terminal, and expansion of surface access roads.

Applying its *Park County* test, the court found that there was no "inextricable nexus" between the runway upgrade and other components of the Master Plan, even though they might currently be linked. The court found that the city could decide to abandon the Master Plan without destroying the proposed action's functionality; the upgrade still would serve the purpose of accommodating the influx of passengers anticipated to occur during the upcoming decades at the state's only commercial jet passenger airport; and that the record showed that the city would upgrade the runway even if the

---

ever, declined to consider the impacts of this substation because the TSRI development

would be supplied power through an existing transmission line. A.R. 2673.

other components of the Master Plan never got off the ground.

The fundamental difference between the proposed runway in *Airport Neighbors Alliance* and the Palm Beach County Biotechnology Research Park, however, is that the record there supported the conclusion that the purpose of the project— serving an anticipated influx in passengers—would be met by the proposed project alone.[30] In this case, the overwhelming record evidence is that the purpose of the Scripps Park is not to serve an existing or anticipated biotechnology need; instead, its purpose is to serve as a catalyst for a "gold rush" of biotechnology industry growth in the area. Throughout the record, the County describes its purpose as to build a 1,919–acre Biotechnology Park in terms of the value of economic and functional industry clustering. Here, the court is unable to defer to the artificial narrowing of that purpose, because it is unsupported by the record, and instead contrary to the overwhelming weight of the evidence.

In *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 180 (3rd Cir.2000), the Third Circuit observed that "Although the impact of a particular project may be inconsequential when considered in isolation, if the cumulative impact of a given project and other planned projects is significant, an applicant can not simply prepare an EA for its project, issue a FONSI, and ignore the overall impact of the project on a particular neighborhood." Although the Third Circuit also adopted the "interdependence" test to the facts in that case, the court also noted that "a court must also consider the likelihood that a given project will be constructed along with the interdependence of other projects.

The more certain it is that a given project will be completed, the more reasonable it is to require a[n] ... applicant to consider the cumulative impact of that project[.]" 210 F.3d at 182.

The court concluded that an EA for the proposed construction of a hotel/parking garage in *Society Hill* was not deficient for failing to consider the impact of future development that had been identified in six different city planning documents, including a proposed "mega" entertainment complex planned at Penn's Landing. The court based this conclusion on the finding that the proposals in the planning documents were not "sufficiently concrete," likely to be completed, or interdependent to warrant inclusion in the EA. The court also noted that there was no record evidence to show that these future plans were expected to materialize.

Again, the facts here present a starkly different situations. Plaintiffs here do not attempt to bring into the equation a series of city plans divorced from the proposed project, but rather urge that the proposed project be considered in the very context in which it was developed. Further, although the proposed project may have independent utility, it certainly is and was not intended to stand alone. Unlike the tangential relationship between a parking garage in one section of Philadelphia and a mega entertainment center in another, here the proposed project and the future planning were developed as an integrated whole, and are intended to support each other, on the site of Mecca Farms. There is no evidence in the record that the County has abandoned its plans to develop the remainder of Mecca—to the contrary, the record evidence clearly shows consistent

---

**30.** The Court notes that whereas the County repeatedly submitted materials to the Corps indicating that the proposed project was to serve as an "anchor" for development of a biotechnology and development park, the Corps removed all references to TSRI as an anchor in its public notices and descriptions of the project purpose. See A.R. 1074; 1152.

and continuous efforts to move on to the "next phases" of Mecca and to prepare for and realize that planned expansion.

As early as June 2004, the record shows that the Corps and County "discussed the future, separate, biotechnology projects and submittals. [The County] mentioned that [they] would like the next project to include the remainder of the southern portion of the Mecca property (i.e. everything south and west of the currently submitted Biotech Research Park–Scripps project area.) [The Corps] stated that as long as [the County] can prove individual utility, that it should be okay. The third and final project would be for the remainder of the Mecca site north of the currently submitted project area." A.R. 1054. The County again thanked the Corps for its "commitment to expedite the review of this important project." A.R. 1053. In a December 2004 email, the Corps Project Manager stated that she was meeting with the County to discuss Scripps and "the next

phases of Mecca," including a power substation. A.R. 2110.

The record in this case aptly demonstrates how too strict an application of the "interdependence test" for evaluating cumulative impacts could lead to an absurd result. In addition, relying exclusively on interdependence would appear to obliterate the distinction between the requirement to analyze "reasonably foreseeable future actions," regardless of who undertakes them, as cumulative effects, and the separate requirement to consider "connected actions" together in one EIS, that the plain language of the regulations suggest.[31]

### c. Alternatives

 NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The EA must address these alternatives.[32] 40 C.F.R. § 1508.9(a). The

---

**31.** The Court notes that the *Park County* interdependence test for determining when a cumulative impact EIS must be performed does not answer the threshold question of what cumulative impacts the Corps must consider when making a finding regarding significance. In *Fritiofson v. Alexander,* 772 F.2d 1225 (5th Cir.1985)over-ruled on other grounds by *Sabine River Authority v. U.S. Dept. of Interior,* 951 F.2d 669 (5th Cir.1992), the Fifth Circuit distinguished the *Kleppe* line of cases as to the proper scope of an EIS from the threshold issue of significance—that is, what must be considered when determining whether an EIS must be prepared at all.

When defining the scope of an EIS, the CEQ regulations do limit consideration of cumulative actions to those that are actually proposed. Those regulations provide that "[t]o determine the scope of environmental impact statements, agencies shall consider ... Cumulative actions, which when viewed with other *proposed actions* have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 CFR § 1508.25.

As the *Fritiofson* court observed, however, at this threshold stage of determining significance, the language of the regulation is broader, requiring consideration of "the impact on the environment which results from the incremental impact of the action when added to other past, present, *and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.*" 40 CFR § 1508.7. Based on this distinction, the Fifth Circuit found that cumulative impacts analysis at the significance stage must be broader, because "[t]he regulations clearly mandate consideration of the impacts from actions that are not yet proposals and from actions—past, present, or future—that are not themselves subject to the requirements of NEPA." 772 F.2d at 1243; citing 40 CFR § 1508.7.

**32.** EA must "include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(a).

alternatives analysis should address "the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. This section must provide a rigorous and objective evaluation of all reasonable alternatives; including the agency's preferred alternative or alternatives; and include appropriate mitigation measures not already included in the proposed action or alternatives. 40 C.F.R. § 1502.14.

Moreover, the Corps' NEPA implementing regulations require that "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." 33 C.F.R. Part 325, Appendix B § 7(b)(3).

However, in this case, the record shows that the Corps' analysis, while narrowing the review of the proposed project's impacts to the 535–acre project, improperly extended the scope of both its benefits and alternatives analysis to the entire Research Park Project.

In its early submissions to the Corps, the County repeatedly stated that the Mecca Farms site was chosen over other explored locations "most importantly for its size and buildable land, less environmental constraints and proximity to the many amenities in Northern Palm Beach County. Other sites were identified by the County, but none of them met the size requirements of TSRI and Palm Beach County." See, e.g., A.R. 480; 1096.

The alternatives analysis provided by the County, and on which the Corps relied, provided that minimum requirements included "at least 500 developable acres." A.R. 2670. However, that analysis also defined the factor of "developability" to include "the ability to accomplish future

phases beyond minimum requirements [phase one] either on-site or offsite within less than 3 miles." A.R. 1740.[33] The scope of the alternatives analysis, then, improperly incorporated consideration of the entire Research Park Project rather than limiting it to the scope of the proposal before the Corps.

The Corps also improperly expanded its scope of the alternatives analysis in its EA to include this greater development. For example, as to the Palm Beach Park of Commerce, the Corps wrote "In evaluating cumulative impacts of foreseeable future development, it must be considered that this site would not support the level of total future development that the County anticipates on the remainder of the Mecca parcel[.]" Although the Corps qualifies this statement by adding "whether or not the Scripps Institute is built there," the only inference supported by the record is that in its alternatives analysis the Corps is considering the County's intended future development, rather than any possible future development. A.R. 2667. Unlike in its assessment of the County's project, the Corps further considered the "secondary and cumulative" impacts of future plans associated with that alternative, such as the development of residential units on Mecca Farms because of limited options for residential development on the Park of Commerce site and "to satisfy [the] anticipated future need," and the consequent extension of Seminole Pratt Whitney Road to access the residential development from the Park of Commerce. A.R. 2667. As to the Briger Parcel, the Corps considered "limited possible future expansion areas" among the secondary and cumulative effects of that site. A.R. 2666. The Corps also found adverse secondary and cumulative effects to include "induced growth, potential for increase in development on

**33.** August 12, 2004 Alternative Site Evalua- tion Final Report.

private parcels," and that "possible future for plans for the area may include expansion of nearby roads." A.R. 2665. The Corps further found that "development on the Briger parcel would increase development on nearby residential and commercial areas, including the Vavrus Ranch and Mecca Farms parcel." A.R. 2665. The Riviera Beach CRA was "determined not to be a viable option due to the lack of developable land," among other considerations. A.R. 2664.

■ The Corps stated that it had evaluated secondary and cumulative effects associated with developing the Mecca site, including induced growth, potential for increase in development on private parcels, and roadway expansions, but did not in fact discuss any such evaluation. A.R. 2663. Merely listing a series of "concerns" does not amount to the "hard look" NEPA requires.

Based on this analysis, the Corps concluded that the project as proposed, with the mitigation proposal, represented the least environmentally damaging practicable alternative. A.R. 2658.

Under the Clean Water Act, for a proposal that is not water dependent, as the one here, the Corps must presume that practicable alternatives exist that do not involve special aquatic sites, unless clearly demonstrated otherwise. 40 C.F.R. § 230.10(a)(3). In addition, the Corps may not not issue a permit for the discharge of dredged or fill material "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as

the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Because the Corps' alternatives analysis was not properly limited in scope, the Court cannot ascertain whether these considerations were adequately addressed.

#### d. Benefits

■ In addition, the Corps' benefits analysis exceeded the scope of the impacts analysis as required by its own regulations and by regulations under the Clean Water Act.[34]

The Corps found that "the overall development of the site with SCRIPPS research biotechnological park would be a considerable economic benefit to the area." A.R. 2645. The Corps noted "economic as well as quality of life benefits ... expected to occur in the general area as a result of new jobs being created, home sales and homes being constructed, and potential future development of a town center with retail stores, the operation [of] a local hospital, and educational opportunities for the public." A.R. 2637. Among the benefits described by the Corps were the construction of a campus for higher education. A.R. 2637. However, it is not clear from this record that such a campus is part of the initial phase of development.

Importantly, the Corps' finding that the project "is estimated to accommodate approximately 18,000 jobs on the site" is based not on this first phase of the project, but on the entirety of the project as projected by the County.[35] A.R. 2645; 2633. Rather, as to phase one, the record shows

---

**34.** Under the CWA, the Corps must balance " benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

**35.** The County's DRI Application provided that "The Research Park is expected to pro-

duce an estimated 18,814 new Florida jobs [on Mecca Farms] by the year 2030. Of the 18,814 new jobs, more than 16,500 are projected to be created with the R & D (biomedical/biotechnological cluster) industry[.] (emphasis added)" A.R. 306, 295 (showing 18,896 permanent jobs by phase five).

no more than between 2,900 and 5,500 jobs being created.[36]

In the EA, the Corps also finds that the County has evaluated the cost to the taxpayers and expects an economic benefit to the area as a result of this development. A.R. 2676. The only cost-benefit analysis in this record, however, contemplates the development of the entire Research Park.

While courts must defer to agency determinations that are supported by the record, they also duty-bound to "overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Sierra Club v. Martin,* 168 F.3d 1, 4 (11th Cir. 1999) (citation omitted).[37]

## V. CONCLUSION

By focusing an agency's attention on the environmental consequences of a proposed project, "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson,* 490 U.S. 332 at 350, 109 S.Ct. 1835, 104 L.Ed.2d 351. For this important reason, adequate environmental evaluation must occur sufficiently early in the planning process to be meaningful. *North Buckhead,* 903 F.2d 1533, 1540 (11th Cir.1990).

In this instance, the Corps's failure to consider the impacts of the planned extension of PGA Boulevard, and to base its finding of independent utility on adequate support in the record render its finding of

no significant impact arbitrary and capricious. Even if the Corps properly limited the scope of its analysis to the 535–acre project, by failing to adequately examine the reasonably foreseeable indirect and cumulative effects of the proposed project, the Corps failed to take the requisite "hard look" at all relevant environmental concerns. In addition, the Corps' Environmental Assessment was critically deficient because its alternatives and benefits analysis did not match the scope of its impact analysis.

Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (DE 39) is DENIED; Plaintiffs' Motion for Summary Judgment (DE 41) is GRANTED; it is further

ORDERED AND ADJUDGED that within ten (10) days of the date of entry of this Order, all parties, including the County and Scripps, shall submit memoranda of law not to exceed fifteen (15) pages in length addressing the issues of remedies; copies of the memoranda shall be promptly served on other parties by facsimile, hand delivery or electronic means; it is further

ORDERED AND ADJUDGED that within five (5) days of service, the parties shall file and serve any responsive memoranda of law not to exceed ten (10) pages in length; copies of the memoranda shall be promptly served on other parties by

---

**36.** The DRI Application shows a total of 2,920 jobs. A.R. 297. The application form narrative stated that the number of jobs from the Scripps enterprise would constitute 5,555, whereas 11,000 more jobs would be created by related biotech/biomedical businesses. A.R. 168–67.

**37.** Plaintiffs have also argued that the highly controversial nature of the project weighs against the Corps' finding of no significance.

"An action is highly controversial where there is substantial dispute about the size, nature or effect of a federal action rather than the existence of opposition to a use." *Georgia River Network v. U.S. Army Corps of Eng'rs,* 334 F.Supp.2d 1329, 1338 (N.D.Ga.2003)(citing *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,* 109 F.Supp.2d 30, 43 (D.D.C. 2000)). The Court notes that based on its findings here, the Corps will have to re-evaluate this element of significance.